UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Jessica Dennis

    v.                          Civil No. 11-cv-302-JL
                                Opinion No. 2012 DNH 165
Town of Loudon, Robert N. Fiske,
Gregory L. Bavis, Robert S.
Akerstrom, and Gregory N. Ferry


**MEMORANDUM ORDER**

The evening giving rise to this civil rights case began like a stereotypical low-budget horror film.  On a summer night a little over three years ago, a group of teenagers--including 18-year-old Jessica Dennis--had a few drinks before venturing into the woods.  Around midnight, while the teens were sitting in a car alongside a desolate road, Dennis heard unsettling noises coming from outside the car.  She panicked, ran, and hid in the woods.[1]  She might have been better off staying in the car.  In those woods lurked something almost as dangerous (to an unlawfully imbibing teenager) as a murderous predator . . .

---

[1]Dennis was clearly unfamiliar with the tropes of the horror movie genre.  See, e.g., Seth Grahame-Smith, How to Survive a Horror Movie: All the Skills to Dodge the Kills 35-36 (2007) (identifying setting off on your own as one of the "seven deadly horror movie sins").  In her defense, though, there is no evidence that before leaving the car, she said "I'll be right back."  Cf. Scream (Dimension Films 1996) ("Never, ever, ever under any circumstances say, 'I'll be right back.'  Because you won't be back.").

. . . a state police sergeant with a K-9 unit, who coincidentally happened to be searching those same woods for a different person.  The dog alerted on Dennis and attacked her, causing minor injuries.  Two Loudon police officers on the scene then arrested Dennis and charged her with unlawful intoxication and resisting arrest.  The Concord District Court later dismissed one of those charges and acquitted Dennis of the other.

Dennis has filed suit against the state police sergeant and the two Loudon officers who arrested her, asserting a claim for alleged violations of her constitutional rights.  See 42 U.S.C. § 1983; U.S. Const. amend. IV.  Specifically, she argues that the dog attack constituted a use of excessive force and that her arrest was unsupported by probable cause.  She also asserts state-law claims for malicious prosecution; strict liability for the dog attack under N.H. Rev. Stat. Ann. § 466:19; negligence in the handling of the dog; battery; and intentional infliction of emotional distress.[2]  This court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

Defendants have moved for summary judgment, see Fed. R. Civ. P. 56, arguing that (1) they are entitled to qualified immunity from Dennis's § 1983 claim, (2) they are entitled to statutory

---

[2]Dennis also filed suit against the Town of Loudon and its police chief, Robert Fiske.  On Dennis's motion, the court dismissed those defendants from the case, see Order of Sept. 17, 2012, so the claims against them are not addressed here.

immunity from the state-law claims arising from the dog attack under N.H. Rev. Stat. Ann. § 508:18-a, and (3) the record evidence entitles them to judgment as to Dennis's remaining state-law claims.  After hearing oral argument, the court grants the defendants' motions for summary judgment in part and denies them in part.  Taking the evidence in the light most favorable to Dennis, a rational jury could find that the officers lacked probable cause to arrest Dennis, in violation of her clearly established Fourth Amendment rights.  The defendants are therefore not entitled to summary judgment on this claim on the basis of qualified immunity.  Defendants are also not entitled to statutory immunity under N.H. Rev. Stat. Ann. § 508:18-a, so their motion for summary judgment is denied as to Dennis's negligence and strict liability claims.

Defendants are, however, entitled to summary judgment as to Dennis's remaining claims.  The excessive force claim fails because the dog attack was unintentional, and therefore Dennis was not "seized" within the meaning of the Fourth Amendment. Intent is also an essential element of a battery claim, and its absence here entitles defendants to summary judgment on that claim.  Defendants are entitled to summary judgment on Dennis's malicious prosecution claim because the record reveals no evidence that the charges against Dennis were motivated by malice.  Finally, because Dennis has assented to the entry of

3

summary judgment against her as to her claim for intentional infliction of emotional distress, see Pl.'s Partial Obj. to Mot. for S.J. (document no. 24) at 2, ¶ 4, the court grants summary judgment to defendants on that count.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial. See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)). A fact is "material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)). In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." Id. The following facts are set forth accordingly.

## II.   **Background**

At about 11:45 p.m. on July 19, 2009, the Merrimack County Sheriff's Office received a complaint of a loud party in a residential area on Lovejoy Road in Loudon, New Hampshire. The

sheriff's dispatcher relayed this information to the Loudon Police Department ("LPD").  Corporal Robert Akerstrom and Patrolman Gregory Bavis of the LPD responded to the scene, where they observed a large number of vehicles in the driveway of a home near the intersection of Lovejoy Road and Dragonfly Lane.

In affidavits accompanying their motion for summary judgment, Akerstrom and Bavis offer slightly different accounts of what they observed upon arriving at the house.[3]  In Akerstrom's recollection, he and Bavis arrived at about the same time and approached the house together.  According to Akerstrom, when he and Bavis knocked on the front door of the home, no one answered, but the occupants hushed their voices and extinguished the lights.  Akerstrom says he then walked around to the back of the house, where he saw a male and female.  Although he told them to stop, the male dropped a cup and fled into the nearby woods, while the female disappeared, presumably into the house.

---

[3]While the differences between the officers' accounts are largely immaterial to the resolution of the motions before the court, they may ultimately have some relevance insofar as they suggest that the officers' recollections of the events at issue are not entirely reliable, due perhaps to the passage of time. In the same vein, the court notes that the officers' accounts, as detailed in their affidavits, differ in some respects from the accounts they gave in sworn testimony in Dennis's criminal trial in Concord District Court.  The court has done its best to reconcile these varying accounts of the evening's events, but it is not possible to reconcile them entirely.  Despite these (minor) inconsistencies, the court draws no negative inference, based on this record, regarding either officer's credibility as a general matter.

According to Bavis, he arrived at the house before Akerstrom and "saw a number of individuals behind the residence, all holding plastic cups or beer cans." When Bavis approached those individuals, who appeared younger than the legal drinking age, a male wearing a red shirt dropped his beer and alerted the others that the police had arrived. All those behind the residence then fled into the house. At that point, Bavis says, the occupants of the house extinguished the lights and refused to acknowledge his knocks at the door. In Bavis's recollection, Akerstrom arrived shortly thereafter and they knocked on the front door together, again without response. A male party attendee then ran into the woods behind the home, despite Akerstrom's order to stop.

Akerstrom and Bavis agree that after this individual ran into the woods, they requested that the state Police respond with a K-9 unit in order to track him. Sergeant Gregory Ferry of the New Hampshire State Police responded to the call with his trained K-9 partner, "Gusta." Upon their arrival at the Lovejoy Road residence, Ferry and Gusta accompanied Bavis into the woods to track the scent of the individual who had fled the party. Ferry instructed Gusta to track the suspect, rather than to bite or hold, and kept the dog on a five- to six-foot lead. Akerstrom went off separately in search of the subject who had fled, and an officer from a nearby town, who had also responded to the disturbance, stayed at the party to maintain the status quo.

At or around the same time, the plaintiff, 18-year-old Jessica Dennis, was sitting with some friends in a sport utility vehicle parked alongside Dragonfly Lane, a cul-de-sac that bordered the side and rear of the lot on which the party was taking place.  The car was parked 150 to 200 feet from the house. Dennis had not attended the party and had never been to the house before.  She says that she heard some men yelling, became scared, and exited the vehicle and ran into the woods.  She sat down on the ground in the woods, where she remained silent and still.

Without warning, and while Dennis remained still, Ferry and Gusta came upon Dennis in the woods and Gusta attacked her, biting her several times on her shoulder, arm, and leg.  Dennis did not resist or fight back, and at some point, the dog clamped its teeth on her tightly and began to drag her across the ground. Ferry was eventually able to regain control of Gusta and stop the attack.

Ferry says in his affidavit that, upon encountering Dennis, "it was readily apparent," based upon his training and experience, "that Ms. Dennis had demonstrated the necessary indicia of having consumed alcoholic beverages within a readily noticeable period before the encounter and was acting under the influence of same at the time."  In more comprehensible language, he explains that Dennis's breath smelled like alcohol, that she was unsteady on her feet, and that her speech was "thick tongued"

and slurred.  Bavis confirms this account, as does Akerstrom (who did not observe Dennis at the scene of the attack, but did observe her later at the police station).  For her part, Dennis admits that she had three drinks between 7:45 and 10:30 p.m. that evening, but says that she felt "completely sober."  Briana Brosnahan, who was with Dennis around the time of her arrest, says that Dennis did not appear to be intoxicated or under the influence of alcohol, and was not having trouble walking or talking.

Ferry and Bavis arrested Dennis, and Bavis later brought her to the LPD station.  At the station, Dennis voluntarily submitted to a Portable Breath Test, or "PBT."  Although Bavis thrice attempted to administer the PBT, Dennis did not properly follow his instructions, and Bavis decided to institute charges against her.  He began to fill out the necessary paperwork, but did not complete it as he needed to go to the hospital to receive treatment for injuries he received while traipsing through the woods without his flashlight on.

After Bavis left, Dennis spoke to Akerstrom and told him she was unhappy with the PBT results.  Akerstrom administered a second PBT, which registered a .077 blood alcohol content. (Briana Brosnahan, who consumed the same amount of alcohol as Dennis, says her own PBT registered only a .014 blood alcohol content.)  Akerstrom says he informed Dennis of her PBT results,

8

and that Dennis indicated that she thought they were accurate. Akerstrom then completed, processed, and signed the arrest and complaint documentation Bavis had prepared, charging Dennis with Unlawful Possession and Intoxication, in violation of N.H. Rev. Stat. Ann. § 179:10, and Resisting Arrest or Detention, in violation of N.H. Rev. Stat. Ann. § 642:2.  Dennis was then released on personal recognizance.

At Dennis's criminal trial, the Concord District Court dismissed the resisting arrest charge, concluding that there was insufficient evidence presented to support it, and acquitted Dennis of the remaining alcohol-related charge.

## III. **Analysis**

### A.    *Count 1 - 42 U.S.C. § 1983*

In Count 1 of the complaint, Dennis seeks recovery under 42 U.S.C. § 1983 for Bavis's and Ferry's alleged violations of her constitutional rights.[4]  Section 1983 "imposes liability upon an individual who, acting under color of state law, deprives a person of federally guaranteed rights." Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004).  In the present case, Dennis alleges that

---

[4]Count 1 also named Akerstrom as a defendant, but Dennis concedes that "he apparently played no role" in her arrest and consents to the entry of summary judgment in his favor on that claim.  Pl.'s Partial Obj. to Mot. for S.J. (document no. 24) at 2, ¶ 4; id. at 19-20, ¶ 42.  The court will oblige.

(1) Ferry used excessive force against her by allowing Gusta to attack her, and (2) both Bavis and Ferry lacked probable cause to arrest her.  Bavis and Ferry contend that they are entitled to qualified immunity, and hence summary judgment, as to each of these claims.

"[T]he doctrine of qualified immunity protects public officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable pers on would have known.'" Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Courts in this circuit apply a two-part test to determine whether a defendant is entitled to qualified immunity.  Martínez-Rodríguez v. Guevara, 597 F.3d 414, 419 n.2 (1st Cir. 2010).  The court considers: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Id.  With respect to Dennis's excessive force claim against Ferry, the court concludes this inquiry at the first step, as no constitutional violation occurred.  But, as explained below, genuine issues of material fact preclude summary judgment for either officer on Dennis's illegal seizure claim.

### 1.   Excessive force

The Fourth Amendment to the U.S. Constitution guarantees citizens the right "to be secure in their persons . . . against

unreasonable searches and seizures." U.S. Const. Am. IV.  This
guarantee prohibits law enforcement officials from employing
"force in excess of an objective standard of reasonableness" to
effect a seizure.  Asociación de Periodistas de P.R. v. Mueller,
529 F.3d 52, 59 (1st Cir. 2008).  But, as is particularly
pertinent here, a Fourth Amendment seizure occurs "only when
there is a governmental termination of freedom of movement
through means intentionally applied."  Brower v. County of Inyo,
489 U.S. 593, 596-97 (1989) (emphasis in original).  Thus,
"[u]nless the restraint of liberty at issue resulted from an
attempt to gain control of the individual, . . . there has been
no Fourth Amendment seizure," and consequently no use of
excessive force.  Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 795
(1st Cir. 1990).

Even when viewed in the light most favorable to Dennis, the
evidence fails to establish that Ferry's use of Gusta was a
"seizure" subject to the Fourth Amendment, because Ferry did not
deploy Gusta with the intention of gaining control of Dennis or
anyone else.  To the contrary, it is undisputed that Ferry was
using Gusta to track the scent of the partygoer who had fled into
the woods, and not to acquire physical control of that person.
He accordingly kept Gusta on five- to six-foot lead while
conducting the search, rather than releasing the dog to run free
in the woods, and commanded the dog to track, not to bite or

hold.  That Gusta came upon a person and attacked her was an
unfortunate, unexpected, and unintended byproduct of that search,
and Ferry immediately took steps to regain control of Gusta when
it happened.

For this reason, the cases upon which Dennis relies are
inapposite.  In those cases, the police released a dog with the
intention that it pursue and subdue someone suspected of a crime
(or, at the very least, with the knowledge that the dog was
inadequately trained and likely to bite, which is not what the
evidence here shows).  See, e.g., Edwards v. Shanley, 666 F.3d
1289, 1292-94 (11th Cir. 2012); Priester v. City of Riviera
Beach, 208 F.3d 919, 923-24 (11th Cir. 2000); Vathekan v. Prince
George's Cnty., 154 F.3d 173, 178-79 (4th Cir. 1998); Kerr v.
City of W. Palm Beach, 875 F.2d 1546, 1551-52 (11th Cir. 1989);
Campbell v. City of Springboro, Ohio, 788 F. Supp. 2d 637, 652-60
(S.D. Ohio 2011); Garcia v. City of Sacramento, No. 10-cv-826,
2010 WL 3521954, *2 (E.D. Cal. Sept. 8, 2010).  In contrast,
where, as here, a trained police dog spontaneously attacks an
individual, courts have concluded that there is no Fourth
Amendment seizure.  See, e.g., Dunigan v. Noble, 390 F.3d 486,
492-93 (6th Cir. 2004); Neal v. Melton, 453 Fed. Appx. 572, 577-
78 (6th Cir. 2011); Andrade v. City of Burlingame, 847 F. Supp.
760, 764-65 (N.D. Cal. 1994).  These cases accord with the view
of the Court of Appeals that, without any "attempt to gain

12

control of" a person, he or she has not been "seized" and the Fourth Amendment is therefore inapplicable.  Landol-Rivera, 906 F.2d at 795.

Gusta's attack could conceivably give rise to a state-law tort claim (such as those discussed infra at Part III.C).  But it does not implicate the Fourth Amendment.  Ferry is entitled to summary judgment on Dennis's excessive force claim.

### 2.  Illegal seizure

The Fourth Amendment's prohibition on unreasonable seizures also embodies a "general rule that every arrest . . . is unreasonable unless it is supported by probable cause."  Michigan v. Summers, 452 U.S. 692, 700 (1981).  Probable cause exists "when, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (ellipse by the court)). The arresting officers' conclusion that probable cause exists need not be "ironclad, or even highly probable.  Their conclusion that probable cause exists need only be reasonable."  United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999). "[S]o long as the presence of probable cause is at least

arguable," the arresting officers are entitled to qualified immunity.  Glik v. Cunniffe, 655 F.3d 78, 88 (1st Cir. 2011). Bavis and Ferry argue that at the time of Dennis's arrest, they had probable cause to believe that she was unlawfully intoxicated in violation of N.H. Rev. Stat. Ann. § 179:10, I, and/or had resisted arrest in violation of N.H. Rev. Stat. Ann. § 642:2.[5] Genuine disputes of fact exist, however, as to whether an officer in defendants' position would have had an objectively reasonable belief that there was probable cause to arrest Dennis for either offense.

Section 179:10, I provides that "any person under the age of 21 years . . . who is intoxicated by consumption of an alcoholic beverage, shall be guilty of a violation."  Bavis and Ferry argue that because they have attested that Dennis had bloodshot eyes, impaired speech, and an unsteady gait, and had the smell of alcohol on her breath, they had reason to believe that she was intoxicated.  Perhaps so--if their account of Dennis's appearance is accurate.

---

[5]Ferry's memorandum of law contains a lengthy discussion of the law applicable to illegal seizure claims, but makes no attempt whatsoever to apply that law to the facts of this case. See Memo. in Supp. of S.J. (document no. 17-1) at 5-8.  Ferry finally gets around to doing so in his reply brief, and although this court ordinarily "does not address theories advanced for the first time in reply," Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, 303 n.16 (D.N.H. 2008), it does so here because Ferry's arguments are (1) essentially identical to those made by his co-defendant Bavis, and (2) ultimately without merit.

But theirs is not the only account of Dennis's appearance. Briana Brosnahan, who was with Dennis shortly before Dennis's arrest, says that Dennis did not appear in any way to be under the influence of alcohol, and was not having any difficulty walking or talking.[6]  This alone would create a genuine issue of material fact as to whether Dennis truly appeared to be intoxicated.  Furthermore, both Brosnahan and Dennis also say that Dennis had only three drinks that evening between 7:45 and 10:30 p.m., finishing the last an hour and a half before her arrest.  A reasonable jury, applying their own lay knowledge of the effects of alcohol consumption, could conclude that Dennis would not have appeared intoxicated, or even smelled of alcohol, at the time of her arrest.  On this record, the court cannot conclude that an officer in defendants' position would necessarily have had a reasonable belief that Dennis was intoxicated.[7]

---

[6]Despite Brosnahan's testimony, which Dennis cites in her opposition memorandum, Ferry's reply memorandum argues that it is "undisputed" that Dennis displayed signs of alcohol impairment. That memorandum also argues that Ferry is entitled to summary judgment on Dennis's illegal seizure claim because it is "undisputed" that Bavis arrested Dennis, and he did not.  But, as Dennis also notes in her opposition memorandum, Bavis himself testified that he "helped Sergeant Ferry place Jessica Dennis under arrest" (emphasis added).  The court is baffled by Ferry's repeated use of the term "undisputed" in these circumstances.

[7]The results of the PBT administered to Dennis at the police station subsequent to her arrest do not undermine this conclusion because, as already noted, the existence of probable cause depends upon facts known to the arresting officer "at the time of

Davis and Ferry also argue that they had probable cause to arrest Dennis under N.H. Rev. Stat. Ann. § 642:2, which prohibits "knowingly or purposely physically interfer[ing] with a person recognized to be a law enforcement official . . . seeking to effect an arrest or detention of the person or another regardless of whether there is a legal basis for the arrest." Bavis and Ferry claim that they shouted a number of warnings before entering the woods, including ordering anyone in the woods to come out, and repeated those warnings and orders several times during the course of their search. They also claim that Akerstrom heard cracking brush in the woods and shouted for who- (or what-) ever was making the sound to stop. Because Dennis did not exit the woods or stop when instructed to do so, they say, they had reason to believe that she had violated § 642:2.

Assuming, dubitante, that remaining in the woods in the face of orders to exit amounts to "physically interfering" with an arrest or detention under § 642:2, defendants' argument suffers from the same problem as their argument that they had probable cause to arrest Dennis for underage intoxication:  there is a

---

the arrest." Holder, 585 F.3d at 504.  While the PBT results may make the officers' recollection of Dennis's appearance more credible, which of the competing versions of the facts to believe remains an issue for the jury to resolve.  See Prokey v. Watkins, 942 F.2d 67, 72-73 (1st Cir. 1991).  That is particularly true where Brosnahan's reported PBT results differed dramatically from Dennis's PBT results, even though the two women ostensibly drank the same amount of alcohol that evening.

genuine dispute as to what actually happened.  Specifically,
viewing the evidence in the light most favorable to Dennis, a
reasonable jury could conclude that the officers never in fact
gave the commands they say they did.  Dennis says she received no
warning before Gusta and Ferry found her, which would support a
finding that they did not.  (Though Dennis admits she heard
yelling while sitting in the SUV, based on the record before the
court, it is equally likely that she heard rowdy partygoers; in
Bavis's own account, he heard someone yelling when he arrived at
the party.)  In addition, neither Bavis's nor Ferry's written
reports of the incident make any mention that they ordered any
person to exit the woods, though they otherwise recount the
events of the evening--including Akerstrom's directives to the
fleeing male partygoer--in detail.  That conspicuous omission
could also be interpreted to support the inference that no such
order was given.[8]  On the present record, then, the court also
cannot conclude that an officer in defendants' position would
reasonably have believed that Dennis had resisted arrest.

---

[8]Even assuming defendants gave those orders, moreover, there
is no evidence that Dennis was found so close to where the orders
were given that defendants could reasonably conclude that Dennis
heard and deliberately disobeyed the orders.  Bavis and Akerstrom
have submitted a number of photographs to the court that, they
say, depict the "general area where plaintiff [was] located."
But those photographs do not assist the court in understanding
the distance between, and relative positions of, the officers and
Dennis at the time the orders were supposedly given.

That brings to a close the first step of the qualified immunity analysis, which requires this court to consider "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Martínez-Rodríguez, 597 F.3d at 419 n.2. Accepting Dennis's version of the facts, as the court must under Rule 56, an officer in defendants' position could not reasonably have concluded that there was probable cause for her arrest. Indeed, the existence of probable cause was not even "arguable" if Dennis's version of the facts is accepted. See Glik, 655 F.3d at 88. Dennis has thus presented sufficient evidence to establish that her Fourth Amendment rights were violated. As for the second step, "whether the right was 'clearly established' at the time of the defendant's alleged violation," id., Ferry and Bavis acknowledge (as they must) that the Fourth Amendment right to be free from arrests in the absence of probable cause was clearly established at the time of Dennis's arrest. See, e.g., id. at 420; Cox, 391 F.3d at 30.

The court's conclusion comes with two caveats. First, even when the facts are viewed in the light most favorable to Dennis, Bavis and Ferry likely had reasonable suspicion to temporarily detain her. See Terry v. Ohio, 392 U.S. 1, 19-20 (1968). She was, after all, found concealed in the woods after midnight in the immediate vicinity of an apparent underage drinking party. The court's discussion should not be taken to suggest that the

officers lacked reasonable suspicion, as only the legality of Dennis's arrest and the existence of probable cause are at issue here.

Second, the court expresses no opinion on whether Dennis will ultimately prevail on her claim.  A reasonable jury could certainly find facts necessitating the conclusion that an officer in defendants' position would have had an objectively reasonable belief that Dennis was intoxicated or had resisted arrest.  But where there are "genuine factual dispute[s] concerning the information known to the officer[s]," as there are here, they cannot "be resolved from the bench by fiat." Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991).  "[I]f what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder." Id. at 73.  Defendants' motion for summary judgment on Dennis's illegal seizure claim is therefore denied.

### B.   Count 2 - malicious prosecution

In Count 2 of the complaint, Dennis seeks recovery against Akerstrom for malicious prosecution.  "To succeed in an action for malicious prosecution, the plaintiff must prove that he was subjected to a criminal prosecution instituted by the defendant without probable cause and with malice, and that the criminal proceeding terminated in his favor." Stock v. Byers, 120 N.H.

844, 846 (1980) (quotation marks omitted).  Akerstrom argues that
he is entitled to summary judgment on this claim because (1) it
was not he, but Officer Bavis, who decided to pursue charges
against Dennis; (2) there was probable cause to charge Dennis
with unlawful intoxication and resisting arrest; and (3) Dennis
has no evidence that he acted with the requisite malice.  The
court agrees that evidence of malice is lacking, and does not
address Akerstrom's alternative arguments.

A plaintiff proves the malice element of malicious
prosecution by showing that the defendant subjected him to a
criminal prosecution "principally because of spite, ill will, or
personal hostility toward him."  Thibodeau v. Mudgett, 2010 DNH
083, 6 (quoting Restatement (Second) of Torts § 668 cmt. *f*
(1977)); see also Toney v. Perrine, 2007 DNH 110, 14-15 ("Malice
exists when the primary purpose in instituting the criminal
proceeding was not to bring an offender to justice, but was, on
the contrary, ill will, personal hostility, or to obtain a
personal advantage." (quotations omitted; emphasis in original)).
There is no evidence in the record that Akerstrom harbored any
sort of "spite, ill will, or personal hostility" toward Dennis,
or acted for any other improper reason.  Akerstrom had only
minimal interaction with Dennis at the police station after her
arrest.  That interaction, which occurred after Bavis had already
begun the charging process, was unremarkable:  at Dennis's own

20

request, Akerstrom administered a PBT and informed her of the inculpatory results, which she accepted.  Nothing in this interaction, or anywhere else in the record, could lead a reasonable finder of fact to conclude that Akerstrom instituted criminal charges against Dennis with malice.

Dennis's reliance upon the New Hampshire Supreme Court's opinion in Hogan v. Robert H. Irwin Motors, Inc., 121 N.H. 737 (1981), is not persuasive.  Hogan did not address what type of evidence is required to prove malice, but primarily discussed whether the advice of the defendant's attorney was sufficient to establish probable cause to commence proceedings against the plaintiff.  See id. at 739-41.  And to the extent the facts in that case shed any light on the element of malice, they are readily distinguishable from the facts of the present case: there, when the plaintiff went to retrieve his automobile from the defendant's garage, he disputed the amount of the bill, became angry, and drove the car off the defendant's lot without paying.  Id.  The defendant then brought charges against the plaintiff for theft of services.  Id.  The tense encounter between the parties in that case, coupled with the fact that the defendant apparently brought criminal charges for an improper purpose, i.e., extracting the full amount of the disputed bill from the plaintiff, could have justified a jury in concluding that the defendant acted maliciously (as that term has been

21

defined under New Hampshire law).  No such facts are present
here, nor, as just discussed, are there any other facts
supporting a finding that Akerstrom acted with an improper
motive.  Akerstrom is acordingly entitled to summary judgment on
Dennis's claim for malicious prosecution.

### C.  *Counts 3-5 - N.H. Rev. Stat. Ann. § 466:19, negligence, and battery*

In Counts 3-5 of the complaint, Dennis asserts claims
against Ferry for strict liability, negligence, and battery,
seeking recovery for the injuries she suffered when Gusta
attacked and bit her.  Ferry argues that he is entitled to the
statutory immunity from these claims provided by N.H. Rev. Stat.
Ann. § 508:18-a.[9]  The court does not agree, and denies summary
judgment to Ferry on Dennis's negligence and strict liability
claims.  Notwithstanding § 508:18-a's inapplicability, Ferry is
entitled to summary judgment on Dennis's battery claim because
Gusta's attack was unintentional.

Section 508:18-a provides:

---

[9]Ferry, who as a state trooper is represented by the New
Hampshire Attorney General, has also argued (incorrectly, as have
litigants represented by the Attorney General in other cases
before this court) that N.H. Rev. Stat. Ann. § 508:18-a immunizes
him from Dennis's excessive force claim under 42 U.S.C. § 1983.
As Dennis correctly notes in her opposition memorandum, though,
"[a] state-conferred immunity cannot shield a state actor from
liability under section 1983."  Camilo-Robles v. Hoyos, 151 F.3d
1, 10 (1st Cir. 1998).

No law enforcement officer or agency shall be held
liable for damages resulting from injuries caused by a
dog used in law enforcement work provided that:

I.  The officer and the dog have completed
training together and received certification from
a nationally recognized organization required for
police work or other law enforcement work or from
the New England State Police Administrators
Compact;

II.  The injury arises out of law enforcement
conduct within the provisions of [N.H. Rev. Stat.
Ann. §] 627:5, I and II; and

III.  The law enforcement agency using a dog in
enforcement work has adopted a written policy on
the necessary and appropriate use of a dog for the
work enumerated in paragraphs I and II.  Said
written policy shall be available for public
inspection at any time.

It is undisputed that subsections I and III of § 508:18-a are

satisfied.  Dennis and Ferry also agree that § 627:5, II, which

governs the use of deadly force, does not apply.  The only matter

on which they disagree is whether Dennis's injuries arose from

"law enforcement conduct within the provisions of" § 627:5, I.

Section 627:5, I provides that "[a] law enforcement officer

is justified in using non-deadly force upon another person when

and to the extent that he reasonably believes it necessary to

effect an arrest or detention . . . ."  In attempting to fit the

facts of the present case within the ambit of this section, one

immediately encounters a stumbling block:  Ferry was not "using

non-deadly force upon another person" when using Gusta to track

the individual who had fled into the woods.  He was not using

force of any kind upon another person.  Instead, he was using the

dog for its sensory capabilities in the same way that law

enforcement officers might use a dog to detect contraband or

locate a toddler that has wandered away from home.[10]

It would not be inconceivable for the New Hampshire General

Court to immunize law enforcement officers from liability for

injuries arising from the use of a dog to track a person, or,

indeed, the use of a dog for any law enforcement purpose.  It has

not chosen to do so, however.  Section 508:18-a unambiguously

specifies that the immunity provided for therein applies

"provided that" the injury arises from law enforcement conduct

involving the use of force.  That phrasing necessarily excludes

the use of a dog for other law enforcement purposes.  Ferry's

argument essentially reads this limitation out of the statute.

---

[10]At oral argument, Ferry's counsel argued that the use of a
police dog to track, rather than to bite and hold, was in fact a
use of force.  The court invited counsel to submit authority for
this proposition, which he did.  See document no. 42.  After
reviewing the cases cited in Ferry's submission, the court does
not agree with his reading of them.  None of those cases involves
the use of a dog solely to track; in each case, the dog in
question was being used specifically to bite and hold a suspect.
See Jarrett v. Town of Yarmouth, 331 F.3d 140, 143 (1st Cir.
2003) (officer released dog "with instructions to locate
[plaintiff] and hold him," i.e., "bite and maintain his hold" on
plaintiff); Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1310-11,
1315-17 (10th Cir. 2009) (police released dog trained to bite and
hold in order to apprehend plaintiffs' decedent); Miller v. Clark
Cnty., 340 F.3d 959, 961 (9th Cir. 2003) (officer released dog
"and gave the dog a command that directed the dog to search for
the suspect and detain him by biting his arm or leg").

Ferry suggested at oral argument that reading § 508:18-a as immunizing the use of police dogs to certain ends but not others would be inconsistent with the statute's purpose or the General Court's intent.  But where, as here, "a statute's language is plain and unambiguous, [the court] need not look beyond it for further indication of legislative intent, and . . . will not consider what the legislature might have said or add language that the legislature did not see fit to include." Cloutier v. City of Berlin, 154 N.H. 13, 17 (2006).  Similarly, speculation as to the statute's "purpose," divorced from reference to the text itself and the "overall statutory scheme," has no place in the court's analysis.  E.g., Blackthorne Group, Inc. v. Pines of Newmarket, Inc., 150 N.H. 804, 806 (2004).  Even so, it is difficult to conceive of any possible purpose of subsection 508:18-a, II other than to make clear that the statute does not provide a blanket immunity for any dog-related injuries.  To the extent Ferry meant to suggest that a literal reading of the statute should be rejected because it would lead to an absurd result, see, e.g., State v. Gallagher, 157 N.H. 421, 423 (2008), the court must disagree.  The court perceives no absurdity in (a) immunizing law enforcement officers from claims arising from intentional police dog attacks--which eliminates a major disincentive against the purposeful deployment of police dogs-- and (b) leaving those officers subject to liability on claims

arising from unintentional dog attacks--which encourages the observance of a reasonable standard of care when handling police dogs generally.

The court accordingly concludes that the immunity provided by N.H. Rev. Stat. Ann. § 508:18-a is inapplicable to the present case.  This does not mean, however, that all of Dennis's claims arising from Gusta's attack may proceed to trial.  Battery is an intentional tort.  Thompson v. Forest, 136 N.H. 215, 219 (1992).  As already discussed in the context of Dennis's excessive force claim, Gusta's attack was unintentional, and Dennis has produced no evidence that Ferry intended for Gusta to bite Dennis or any other person.  See Part III.A.1 supra.  Ferry is therefore entitled to summary judgment on Dennis's battery claim.  Dennis's claims for negligence and strict liability survive (for now).[11]

---

[11]The court must confess some skepticism as to Dennis's ability to recover under either of those two theories.  To prevail on a negligence theory, Dennis must show that Ferry failed to conform "to the standard of care appropriate under the circumstances."  Morse v. Goduti, 146 N.H. 697, 699 (2001).  The appropriate standard of care when using a trained police dog to track strikes the court as a matter beyond the ken of the average layperson, such that expert testimony would be required to establish it.  See, e.g., Wong v. Ekberg, 148 N.H. 369, 373-74 (2002); Lemay v. Burnett, 139 N.H. 633, 634-36 (1995).  Dennis's counsel admitted at oral argument that he had not retained an expert on this issue.

The court also questions whether N.H. Rev. Stat. Ann. § 466:19, the strict liability "dog bite statute," applies to the use of dogs by the state police.  In Blais v. Town of Goffstown, 119 N.H. 613, 616-18 (1979), the New Hampshire Supreme Court held that the statute is "inapplicable to suits against municipalities for injuries suffered from their reasonable use of police dogs."

## IV.  **Conclusion**

For the reasons set forth above, the motions for summary judgment of defendants Ferry, Akerstrom, and Bavis[12] are GRANTED in part and DENIED in part.  The motion for summary judgment of defendants Town of Loudon and Fiske[13] is DENIED as moot.  Count 1 (illegal seizure) remains pending against defendants Ferry and Bavis, and Counts 3 (strict liability) and 4 (negligence) remain pending against Ferry only.  Summary judgment is granted to defendants on all other counts.

Plaintiff's counsel both appear before this court frequently in both civil and criminal cases.  As such, the court expects

---

It would strike the court as somewhat unusual for the statute to nonetheless permit suits against the state (or state officers) "for injuries suffered from their reasonable use of police dogs." In interpreting the statute, however, the Blais court relied upon the fact that, at the time of the statute's enactment, (a) "municipal police forces were not using attack dogs," and (b) municipalities "enjoyed near-complete immunity from suits sounding in tort."  Id. at 617.  Under these circumstances, the court observed, "there would have been no occasion" for the legislature to specifically exclude municipalities from the statute's coverage.  Id.  Although this court is not inclined to undertake such extra-textual exploration into legislative intent, under this same reasoning, if state police forces or their equivalent were using dogs at the time of the statute's enactment, or if the state did not enjoy similar immunity from tort claims at that time, the statute may well apply to state police dogs.  None of the parties have briefed this issue, though, and without the benefit of reasoned argument the court will not wade into this mire sua sponte.

[12]Documents nos. 17, 20.

[13]Document no. 19.

them to be familiar with and observe the local rules of this court.  Counsel are reminded that pursuant to Local Rule 7.1(a)(3), "no memorandum in support of, or in opposition to, a dispositive motion shall exceed twenty-five (25) pages."  Both of plaintiff's opposition memoranda in this case exceed thirty pages, in clear contravention of this rule.  Plaintiff's counsel are cautioned that if they fail to observe this rule in future cases, sanctions may be forthcoming.  See L.R. 1.3(a).

   **SO ORDERED.**

                                         _____
                                         Joseph N. Laplante
                                         United States District Judge

Dated: September 20, 2012

cc:  Michael J. Sheehan, Esq.
     Nicholas Brodich, Esq.
     John A. Curran, Esq.
     Kevin H. O'Neill, Esq.
     David M. Hilts, Esq.